UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

MICHAEL JOSEPH MATTINGLY,

              Plaintiff,

     v.

CALIFORNIA DEPARTMENT OF PARKS
AND RECREATION, et al.,

              Defendants.

Case No.  23-cv-03754-VKD

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

Re: Dkt. No. 39

      Plaintiff Michael Joseph Mattingly, who is representing himself, filed this action against the California Department of Parks and Recreation ("CDPR") and nine of its officers, asserting federal and state law claims for violations of his civil rights.  *See* Dkt. No. 1.  Defendants now move for summary judgment.  Dkt. Nos. 39, 45.  Mr. Mattingly opposes the motion.  Dkt. No. 44.[1] Upon consideration of the moving and responding papers, as well as the oral arguments presented, the Court grants in part and denies in part defendants' motion for summary judgment.[2]

## I.    BACKGROUND

      Mr. Mattingly's claims concern events surrounding his trips to Twin Lakes State Beach ("Twin Lakes") in Santa Cruz County, California and his July 31, 2021 arrest.  Unless otherwise indicated, the following facts are undisputed.

---

[1] Mr. Mattingly's opposition brief exceeds the 25-page limit.  *See* Civil L.R. 7-3(a).  The Court nonetheless has considered all of his opposition papers and supporting documents.  However, future non-compliant filings may be stricken and not considered by the Court.

[2] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 16, 19, 20, 21.

United States District Court
Northern District of California

Twin Lakes is part of the California state park system, which is within CDPR's jurisdiction and control.  *See* Cal. Pub. Res. Code §§ 5001(a)(3), (b); 5001.6(b)(6)(A).  Among CDPR's powers is the authority to "establish rules and regulations not inconsistent with law for the government and administration of the property under its jurisdiction."  *Id*. § 5003.  The primary duties of CDPR peace officers include "enforcement of the rules and regulations established by [CDPR] and the arrest of persons for the commission of public offenses within the property" under CDPR's jurisdiction.  *Id*. § 5008(b), (c).  "Any person who violates the rules and regulations established by [CDPR] is guilty of either a misdemeanor, punishable by imprisonment in the county jail not exceeding 90 days, or by a fine not exceeding one thousand dollars ($1,000), or by both that fine and imprisonment, or an infraction punishable by a fine of not more than one thousand dollars ($1,000)."  *Id*. § 5008(d).

Among the rules established by CDPR are those prohibiting alcohol and glass containers on the beach; proscribing the lighting, building, use, or maintenance of fires in the sand; and setting park hours.  *See* 14 C.C.R. §§ 4311, 4333, 4326(a).  CDPR posted a sign at Twin Lakes stating that the park hours are 6:00 a.m. to 10:00 p.m.  Dkt. No. 40 ¶ 5, Ex. D.[3]

On July 24, 2021, Mr. Mattingly was at Twin Lakes playing music, which he says is a means of protesting what he considers to be unlawful orders regarding access to the beach.  That evening, after packing up his music equipment, he went to say goodbye to others on the beach.  *See* Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 32:1-4).  He was there on the beach when officers approached.  *Id*. (Mattingly Dep. at 32:5-7).  Defendant Ryan Thorne, who was at that time a CDPR peace officer, contacted the group and informed them that they were in violation of various regulations, including those prohibiting alcohol and glass containers on the beach, building fires in the sand, and being at the beach after 10:00 p.m.  Officer Thorne asked the group to leave.  *See* Dkt. No. 44-3 at 2 (Interrogatory No. 1); *see also* Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 32:8-

---

[3] Defendants request that the Court take judicial notice that Twin Lakes has "a District Superintendent Posted Order #715-001-20" setting park hours.  Dkt. No. 41.  The Court takes judicial notice, not as to disputed facts, but solely with respect to the existence of the sign at Twin Lakes stating the hours that the park is open, which appear to be matters that are not subject to reasonable dispute.  Fed. R. Evid. 201; Dkt. No. 40 ¶ 5, Ex. D; Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 56:10-12; 57:4, 8-9).

2

United States District Court
Northern District of California

1   19).  Mr. Mattingly says that defendant Peter Estes, who was at that time a CDPR sergeant, asked

2   him for identification.  Mr. Mattingly did not have his identification, and Sergeant Estes left.  Dkt.

3   No. 40 ¶ 3, Ex. B (Mattingly Dep. at 33:6-11).  There is no indication that any CDPR officer

4   issued citations to Mr. Mattingly or to others in the group that night.  *See id*. (Mattingly Dep. at

5   33:12-14; 34:10-13; 43:19-21; 43:25-44:4).

6           After the July 24, 2021 encounter with CDPR officers, Mr. Mattingly called CDPR to find

7   out who the officers were on the beach that night and to complain that an officer shined his

8   flashlight in a baby's eyes.  Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 35:24-37:23).  Captain Joe

9   Walters returned the call and spoke with Mr. Mattingly.  *See id*. (Mattingly Dep. at 36:11-14, 19-

10  20; 37:10-11); Dkt. No. 44-23 (Walters Dep. at 4:10-20).  According to Mr. Mattingly, Captain

11  Walters said that he would look into the matter and get back to Mr. Mattingly.  Mr. Mattingly told

12  Captain Walters that his name was "Michael Joseph" because he felt he "was being targeted by the

13  State Parks" and did not want to give Captain Walters his last name.  *See id*. (Mattingly Dep. at

14  38:10-14); *see also* Dkt. No. 44-23 (Walters Dep. at 4:10-20).  Captain Walters did not tell Mr.

15  Mattingly that he needed to fill out a complaint form; Mr. Mattingly did not file a written

16  complaint; Captain Walters did not conduct an investigation because no written complaint was

17  submitted; and Mr. Mattingly says that Captain Walters did not get back to him.  *See id*.

18  (Mattingly Dep. at 38:1-2, 6-9); Dkt. No. 44-3 (Walters Dep. at 5:3-13); Dkt. No. 44-24 at 4-5

19  (Interrogatory No. 3).

20          On July 31, 2024, Mr. Mattingly returned to Twin Lakes, arriving around 5:00 or 6:00 p.m.

21  Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 46:10-14).  After parking his car, Mr. Mattingly says that he

22  walked over to some other people who are usually at the beach on Saturdays.  *Id*. (Mattingly Dep. at

23  44:18-21).  Mr. Mattingly estimates that sometime between 6:30 p.m. and 8:00 p.m., he had an

24  encounter with Officer Thorne.  *Id*. (Mattingly Dep. at 46:19-47:7).  Mr. Mattingly asked Officer

25  Thorne if Captain Walters had contacted him.  *Id*. (Mattingly Dep. at 45:3-4; 46:15-23).  Officer

26  Thorne asked Mr. Mattingly to turn down the music because people had complained.  Mr. Mattingly

27  says another individual present on the beach turned down the music.  *Id*. (Mattingly Dep. at 46:15-

28  47:1); *see also* Dkt. No. 44-2 at 13-14 (RFA No. 52); Dkt. No. 44-3 at 2-3 (Interrogatory No. 1).

3

United States District Court
Northern District of California

Mr. Mattingly says that he then made six or seven trips to his car and set up his music equipment. He says that he usually starts playing music around 8:00 p.m. He believes that he played music by himself that night, and that he finished playing at around 10:00 p.m. *Id.* (Mattingly Dep. at 45:5-15; 47:6-7). Mr. Mattingly sat for a while afterward talking with people. Then he went to get his car and packed up his belongings. *Id.* (Mattingly Dep. at 45:15-18). He says that he was loading and parking his car when CDPR officers arrived on the beach. *Id.* (Mattingly Dep. at 45:18-20; 47:8-13). According to Mr. Mattingly, he was at the top of a staircase and not on the beach at that time. *Id.* (Mattingly Dep. at 45:22-23). He says it was not until later that he went back down to say goodbye to people on the beach. *See id.* (Mattingly Dep. at 45:21-24; 47:8-13, 21-25; 50:1-25).

According to defendants, at around 10:45 p.m., Officer Thorne approached a group of people on the beach, who defendants say were gathered around an illegal fire built into the sand. Officer Thorne told the group that the beach had closed at 10:00 p.m., and requested that they pack their things and leave. Dkt. Nos. 40 ¶ 11, Ex. J and 44-1 (Thorne Dep. at 9:3-8; 36:17-20). Officer Thorne testified in deposition that "since it was a large group," officers contacted Sergeant Estes to "see if there were other officers available" to assist them. Dkt. Nos. 40 ¶ 11, Ex. J and 44-1 (Thorne Dep. at 36:18-24). Officer Thorne says that he recognized Mr. Mattingly from their encounter earlier in the day regarding the loud music. In deposition, he testified that at this time, Mr. Mattingly was on the beach with the group, in the area around the fire. *See* Dkt. Nos. 40 ¶ 11, Ex. J and 44-1 (Thorne Dep. at 9:3-8; 9:14-10:6; 10:21-11:21; 40:8-18); *see also* Dkt. No. 44-3 at 3 (Interrogatory No. 3).

As noted above, Mr. Mattingly claims that he was loading and parking his car and was not on the beach when officers first approached the group. Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 45:18-24; 47:8-13, 21-25; 50:1-17). He testified in deposition that he did not hear what officers said to the group at that time. However, he does not dispute that he went down to the beach sometime after 10:45 p.m. *Id.* (Mattingly Dep. at 50:18-25). When he was on the beach, Mr. Mattingly says that his friends asked him to "serve" a "notice" on Sergeant Estes. Mr. Mattingly says that he agreed to "stick around a minute, see who shows up," and then "leave after [he] serv[ed] th[e] notice." *Id.* (Mattingly Dep. at 45:24-46:5). Mr. Mattingly says that he did not read the notice

4

1    beforehand, giving it "just a cursory glance just to make sure that it had been signed and things

2    like that." *Id*. (Mattingly Dep. at 63:24-64:3).  There is no indication that the papers in question

3    included a court order or other document filed in any court.  Rather, the record indicates that they

4    consisted of a document titled "LAWFUL NOTIFICATION," which was written and signed by

5    Mr. Mattingly's friend, Benjamin Cogan.  The document was directed to Sergeant Estes

6    "personally as PUBLIC SERVANT of the People," and essentially "informed [Sergeant Estes]

7    that the State Parks Police lacked lawful authority to arrest or cite individuals for being on the

8    beach." *See* Dkt. No. 1 ¶ 12; *see also* Dkt. No. 40 ¶ 3 (Mattingly Dep. at 63:17-19; 67:7-19;

9    67:25-68:3); Dkt. No. 40 ¶ 4, Ex. C.

10        Mr. Mattingly was on the beach when a larger group of about seven CDPR officers arrived

11    at approximately 11:41 p.m. *Id*. (Mattingly Dep. at 50:23-25); *see also* Dkt. No. 44-1 (Thorne

12    Dep. at 35:19); Dkt. No. 44-2 (RFA No. 35); Dkt. No. 44-5 (RFA No. 44); Dkt. No. 44-8 (RFA

13    No. 37); Dkt. No. 44-12 (RFA 29); Dkt. No. 44-14 (RFA No. 34); Dkt. No. 44-17 (RFA No. 25);

14    Dkt. No. 44-20 (RFA No. 25).  This larger group of officers included all of the defendant officers,

15    except Captain Walters and Captain McKenna.  The officers estimated that the group they were

16    approaching on the beach included about 10 to 15 people. *See* Dkt. No. 44-1 (Thorne Dep. at

17    35:21-24); Dkt. No. 44-4 (Estes Dep. at 10:8-9).  Mr. Mattingly appears to contend that there were

18    fewer than 10 people in the group on the beach, although it is unclear how many people he

19    believes were there, and he points to no evidence on this point. *See* Dkt. No. 44 at 11, 12.

20        Sergeant Estes approached the group on the beach, identified himself, and stated that

21    ground fires are not allowed.  He also stated that the group was on the beach after 10:00 p.m., and

22    asked them if they would leave.  Mr. Mattingly asked Sergeant Estes for his name.  Sergeant Estes

23    identified himself again and then said, "Mike Mattingly, are you going to be leaving the beach

24    tonight?," or words to that effect.  Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 51:3-10); *see also*

25    Mattingly Ex. ZB.  Sergeant Estes testified in deposition that he believed Mr. Mattingly might be

26    "Mike Mattingly" from an internet article he had seen beforehand, but did not know if that

27    actually was his name.  Dkt. No. 44-4 (Estes Dep. at 5:20-23).  Sergeant Estes says that calling out

28    someone's name is a tactic he has used to see how people react, as people generally react to their

United States District Court
Northern District of California

own name.  *Id*. (Estes Dep. at 5:25-6:7).  According to Sergeant Estes, Mr. Mattingly reacted by repeatedly trying to give him papers.  *Id*. (Estes Dep. at 6:8-9).

Mr. Mattingly asked Sergeant Estes for a card.  Mr. Mattingly says that he did so because he wanted to be sure he was serving the papers on the right person.  Sergeant Estes told Mr. Mattingly that he had a card, and that he would address the request later.  Mr. Mattingly says that he repeated his request for a card, and that he attempted to hand the papers to Sergeant Estes. Sergeant Estes repeatedly asked Mr. Mattingly if he was going to leave the beach, and Mr. Mattingly kept trying to hand the papers to Sergeant Estes.  Sergeant Estes did not take the papers Mr. Mattingly was trying to give to him.  Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 51:11-15; 51:24-52:5); Ex. F (Estes Dep. at 36:4-10).

At this point, Mr. Mattingly says that Sergeant Estes walked to the left and tried to cross Mr. Mattingly, then turned into Mr. Mattingly while telling him to step back to Sergeant Estes's partners.  According to Mr. Mattingly, he was holding his cell phone in his right hand filming the incident, while holding the papers in his left hand.  He says that he was already walking backward when Sergeant Estes used his chest to push Mr. Mattingly back into the other officers.  Mr. Mattingly says that his cell phone and papers were knocked out of his hands, and that he was held against his will while someone handcuffed him.  Mr. Mattingly says that no one told him why he was being handcuffed.  *See* Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 53:19-54:2, 64:14-22; 65:14-17, 20-25; 70:8-16).

According to defendants, the situation on the beach that night created officer safety concerns, as the officers were outnumbered by the group.  *See, e.g.*, Dkt. No. 40 ¶ 6, Ex. E & Dkt. No. 44-19 (Ackemann Dep. at 8:9-16; 13:8-14); Dkt. No. 40 ¶ 7, Ex. F & Dkt. No. 44-4 (Estes Dep. at 9:22-10:14; 18:22-19:11); Dkt. No. 44-5 (RFA No. 22).  Defendants maintain that Mr. Mattingly did not leave the beach and did not comply with Sergeant Estes's repeated directions to step back.  While there appears to be no dispute that Mr. Mattingly and Sergeant Estes ended up face-to-face and very close to one another, the officers' version of the events as they unfolded differs in some respects from Mr. Mattingly's account.  For example, Officer Tabone testified that after repeatedly asking if Mr. Mattingly would leave the beach, Sergeant Estes tried to step around

Mr. Mattingly, while directing him to step back, and Mr. Mattingly "kind of turned to stay in front of [Sergeant Estes.]"  Dkt. No. 40 ¶ 10, Ex. I & Dkt. No. 44-7 (Tabone Dep. at 10:1-17).  Officer Tabone determined that it was time to "put hands" on Mr. Mattingly "once [Mr. Mattingly] and [Sergeant] Estes were very close, face to face, and [Mr. Mattingly] was not obeying his commands to step back, or move[] towards us."  Dkt. No. 40 ¶ 10, Ex. I & Dkt. No. 44-7 (Tabone Dep. at 11:2-4, 18-24; 14:2-4, 10-13; 14:25-15:8).  Defendants say that in order to control the scene, Officers Tabone and Weaver stepped forward and placed Mr. Mattingly in a department-approved control hold and walked him back from the group, at which point Officer Thorne put Mr. Mattingly in handcuffs to detain him.  *See* Dkt. No. 40 ¶ 7, Ex. F & Dkt. No. 44-4 (Estes Dep. at 32:23-33:10; 34:13-25); Dkt. No. 40 ¶ 10, Ex. I & Dkt. No. 44-7 (Tabone Dep. at 7:15-9:8); Dkt. No. 40 ¶ 14, Ex. M & Dkt. No. 44-10 (Weaver Dep. at 4:23-5:16; 9:21-11:12); Dkt. No. 44-1 (Thorne Dep. at 13:15-16; 14:4-14; 19:4-11, 21-22; 19:24-20:4).  Officers Tabone, Weaver, and Thorne then walked Mr. Mattingly to a patrol vehicle.

Officer Thorne placed Mr. Mattingly in a patrol vehicle.  *See*  Dkt. No. 44-2 (Thorne RFA No. 60).  At some point, Officer Thorne placed Mr. Mattingly under arrest, although he testified in deposition that he did not recall if he specifically told Mr. Mattingly that he was under arrest, or if another officer did so.  Dkt. No. 44-1 (Thorne Dep. at 4:13-19; 44:21-24); *see also* Dkt. No. 40 ¶ 14, Ex. M & Dkt. No. 44-10 (Weaver Dep. at 4:16-17).  Sergeant Estes testified in deposition that Mr. Mattingly was arrested for being on the beach after it closed in violation of California Code of Regulations § 4326(a).  He says that he attempted to issue Mr. Mattingly a citation for that violation, and asked Mr. Mattingly to identify himself and sign the citation, after which he would be released.  Mr. Mattingly does not deny that he refused to identify himself, but says that as Sergeant Estes had called him out by name and already seemed to know who he was, he did not feel that he needed to confirm that he was Mike Mattingly.  Additionally, Mr. Mattingly believed that the option to be cited and released is essentially contracting with the government, which is something he did not wish to do.  Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 68:8-14; 71:19-24; 74:13-75:13, 75:24-76:23; 78:23-79:21); Dkt. No. 40 ¶ 7 Ex. F & Dkt. No. 44-4 (Estes Dep. at 11:22-13:6; 22:25-23:10); Dkt. No. 40 ¶ 11, Ex. J & Dkt. No. 44-1 (Thorne Dep. at 34:6-12).

1     When Mr. Mattingly refused to identify himself and receive the citation, Sergeant Estes testified

2     that Mr. Mattingly provided another basis to arrest him for violation of California Penal Code

3     § 148(a). *See* Dkt. No. 40 ¶ 7, Ex. F & Dkt. No. 44-4 (Estes Dep. at 23:4-7).

4         Mr. Mattingly maintains that before he was handcuffed, no one told him that he would be

5     cited or arrested if he did not leave Twin Lakes. When Sergeant Estes asked Mr. Mattingly if he

6     would leave the beach, Sergeant Estes testified that he was politely ordering Mr. Mattingly to

7     leave. Mr. Mattingly says that he did not understand Sergeant Estes's question to be a request or a

8     command to leave. He also contends that no one told him why he was being handcuffed, and that

9     no one told him that he was under arrest. *See* Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 58:20-22;

10     65:23-25; 76:24-25; 78:18-21); Dkt. No. 40 ¶ 7, Ex. F & Dkt. No. 44-4 (Estes Dep. at 23:14-24:3;

11     24:21-25); *see also* Dkt. No. 44-2 (Thorne RFA No. 27); Dkt. No. 44-5 (Estes RFA No. 26); Dkt.

12     No. 44-8 (Tabone RFA No. 26); Dkt. No. 44-12 (Weaver RFA No. 18).

13         According to Mr. Mattingly's complaint, he was held at the Santa Cruz County Jail

14     overnight for more than twelve hours and released on August 1, 2021. He says that the matter

15     proceeded to a jury trial in state court, and that all charges were dismissed on November 30, 2022.

16     Dkt. No. 1 ¶¶ 10, 54.

17         Although the CDPR officers were armed, there is no evidence or any claim that they drew

18     their weapons at any time during the July 31, 2024 encounter. Dkt. No. 40 ¶ 3, Ex. B (Mattingly

19     Dep. at 67:2-5). It is also undisputed that Mr. Mattingly was not physically combative, did not

20     physically resist arrest, and did not threaten officers or try to flee at any time during the July 31,

21     2021 encounter. *See, e.g,* Dkt. No. 44-1 (Thorne Dep. at 20:25-21:3; 45:8-11); Dkt. No. 44-2

22     (Thorne RFA Nos. 69-71); Dkt. No. 44-5 (Estes RFA Nos. 51, 52); Dkt. No. 44-8 (Tabone RFA

23     Nos. 52-54).

24         On July 27, 2023, Mr. Mattingly filed the present action against CDPR and its officers,

25     asserting violations of his civil rights, pursuant to 42 U.S.C. § 1983, for false arrest in violation of

26     the Fourth Amendment of the U.S. Constitution (claim 1), false imprisonment in violation of the

27     Fifth Amendment of the U.S. Constitution (claim 2), and retaliation in violation of the First

28     Amendment of the U.S. Constitution (claim 3), as well as a claim for violation of the California

1   Constitution, Article X, section 4 (claim 4), and a "California Government Claim" (claim 5).  Mr.

2   Mattingly seeks damages, declaratory relief, and injunctive relief "enjoining the [defendants] from

3   engaging in further violations of [his] constitutional rights."  Dkt. No. 1 ¶¶ 135-144.

4        On November 2, 2023, the Court granted CDPR's motion to dismiss the federal claims

5   asserted against it.  Dkt. No. 26.

6        Defendants now move for summary judgment on all claims.  CDPR contends that the

7   Eleventh Amendment bars Mr. Mattingly from bringing suit against the agency in federal court.

8   The defendant officers contend that they are entitled to summary judgment, arguing that there was

9   reasonable suspicion to detain Mr. Mattingly and probable cause to arrest him.[4]  In any event, all

10  of the defendant officers maintain that they are entitled to qualified immunity.  Additionally,

11  defendants argue that there was no violation of Article X, section 4 of the California Constitution,

12  and that they are entitled summary judgment on Mr. Mattingly's "California Government Claim"

13  on the ground that Mr. Mattingly failed to comply with the Government Claims Act.

## II.    LEGAL STANDARD

15       A motion for summary judgment should be granted if there is no genuine issue of material

16  fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

17  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  The moving party bears the initial

18  burden of informing the court of the basis for the motion, and identifying portions of the

19  pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the

20  absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In

21  order to meet its burden, "the moving party must either produce evidence negating an essential

22  element of the nonmoving party's claim or defense or show that the nonmoving party does not

23  have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

24  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).

*United States District Court*
*Northern District of California*

---

[4] Although the preamble to defendants' summary judgment motion asserts that defendants Captain Walters and Captain McKenna "are entitled to judgment in their favor on Plaintiff's First, Second and Third Claims as there is no supervisory liability under 42 U.S.C. § 1983" (Dkt. No. 39 at 2), defendants did not actually present any argument or authority on that issue in the body of their motion.  Accordingly, the Court does not address it.

United States District Court
Northern District of California

1    If the moving party meets its initial burden, the burden shifts to the non-moving party to

2   produce evidence supporting its claims or defenses.  *See id*. at 1102.  The non-moving party may

3   not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce

4   admissible evidence that shows there is a genuine issue of material fact for trial.  *See id*.  A

5   genuine issue of fact is one that could reasonably be resolved in favor of either party.  A dispute is

6   "material" only if it could affect the outcome of the suit under the governing law.  *Anderson*, 477

7   U.S. at 248-49.

8   ## III.   DISCUSSION

9   ### A.   Eleventh Amendment

10   CDPR moves for summary judgment on the ground that the Eleventh Amendment bars Mr.

11   Mattingly's claims against the agency.  Absent consent to suit, "a suit in which the State or one of

12   its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."

13   *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  "Longstanding Supreme

14   Court precedent has interpreted this Amendment to immunize states from suit in federal court by

15   citizens and noncitizens alike."  *Kohn v. State Bar of Cal.*, 87 F.th 1021, 1025-26 (9th Cir. 2023).

16   "This immunity extends not just to suits in which the state itself is a named party but also to those

17   against an 'arm of the [s]tate.'"  *Id*. (quoting *Mt. Healthy city Sch. Dist. Bd. of Educ. v. Doyle*, 429

18   U.S. 274, 280 (1977)).

19   CDPR was created by the California Legislature to administer California's state parks.  *See*

20   Cal. Pub. Res. Code § 5001; *see also* Cal. Gov. Code § 900.6 ("'State' means the State and any

21   office, officer, department, division, bureau, board, commission or agency of the State claims

22   against which are paid by warrants drawn by the Controller.").  District courts in California have

23   found that CDPR is a state agency for purposes of Eleventh Amendment immunity.  *See, e.g.,*

24   *Paul v. Redwood Nat'l & State Parks Dep't*, No. 17-cv-07197-SI, 2018 U.S. Dist. LEXIS 106877,

25   at *2 (N.D. Cal. June 26, 2018) (dismissing CDPR from § 1983 civil rights action "because the

26   CDPR, as a state agency, is immune from suit under the Eleventh Amendment."); *Hahn v. Cal,*

27   *Dep't of Parks & Recreation*, No. 2:09-cv-01479-JAM-GGH, 2009 WL 3048716, at *3 (E.D. Cal.

28   Sept. 18, 2009) (dismissing claims against CDPR because "[a]s a state agency, [CDPR] is

1  protected by the Eleventh Amendment and cannot be sued in federal court for any of the claims

2  for relief" sought by plaintiff).

3         In his opposition papers, Mr. Mattingly offered no argument or evidence to the contrary.

4  Accordingly, CDPR's motion for summary judgment based on Eleventh Amendment immunity is

5  granted. All remaining claims against CDPR are dismissed.

6       **B.**      **Claim 1: Fourth Amendment—Unlawful Arrest (42 U.S.C. § 1983)**

7         Mr. Mattingly's claim for unlawful arrest, brought pursuant to 42 U.S.C. § 1983, is based

8  on an alleged violation of his Fourth Amendment rights. He asserts this claim against the seven

9  officers who were present at Twin Lakes on the night of his arrest (i.e., Sergeant Estes and

10  Officers Thorne, Tabone, Weaver, Ward, Ackemann, and Filous). *See* Dkt. No. 1 ¶¶ 20-60. These

11  officers move for summary judgment on the ground that they had probable cause to arrest Mr.

12  Mattingly for violating California Code of Regulations § 4326(a) and California Penal Code

13  § 148(a). And even if they lacked probable cause, defendants argue that they are entitled to

14  qualified immunity.

15         "Under the Fourth Amendment, a warrantless arrest requires probable cause." *United*

16  *States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). "Probable cause to arrest exists when

17  officers have knowledge or reasonably trustworthy information sufficient to lead a person of

18  reasonable caution to believe that an offense has been or is being committed by the person being

19  arrested." *Id.* (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *see also Devenpeck v. Alford*, 543

20  U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to

21  be drawn from the facts known to the arresting officer at the time of the arrest."). "Because the

22  probable cause standard is objective, probable cause supports an arrest so long as the arresting

23  officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated

24  reason for the arrest." *Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 954 (9th Cir.

25  2010) (citing *Devenpeck*, 543 U.S. at 153-55); *see also Whren v. United States*, 517 U.S. 806, 813

26  (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment

27  analysis."). Probable cause "is not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014),

28  and requires only "the kind of fair probability on which reasonable and prudent people, not legal

United States District Court
Northern District of California

1

2

3

4

5

technicians, act," *Florida v. Harris*, 568 U.S. 237, 244 (2013) (cleaned up).  While the existence of probable cause generally is a question for the jury, "summary judgment is appropriate when there is no genuine issue of fact and if no reasonable jury could find an absence of probable cause under the facts."  *Johnson v. Barr*, 79 F.4th 996, 1003 (9th Cir. 2023) (quotations and citation omitted).

6

7

8

9

10

11

12

13

For the reasons discussed below, the Court finds that disputes of material fact preclude summary judgment to the extent defendants contend they had probable cause to arrest Mr. Mattingly for violating California Penal Code § 148(a).  However, the Court finds as a matter of law that probable cause supports Mr. Mattingly's arrest based on California Code of Regulations § 4326, and that defendants would, in any event, be entitled to qualified immunity on that issue.  As the determination of probable cause regarding California Code of Regulations § 4326 is sufficient to resolve Mr. Mattingly's Fourth Amendment unlawful arrest claim, defendants are entitled to summary judgment on that claim.

14

### 1.    California Penal Code § 148(a)

15

16

17

18

19

20

21

22

23

24

25

California Penal Code § 148(a) makes it a misdemeanor to "willfully resist, delay, or obstruct any public officer [or] peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment[.]"  The parties dispute whether Mr. Mattingly was merely detained on the beach at the time he was handcuffed, or whether he was arrested at that time.[5]  In addition, as defendants acknowledge in their motion papers, there are fact disputes regarding whether Mr. Mattingly complied with Sergeant Estes's orders to step back.  *See* Dkt. No. 39 at 15.  Indeed, there are material fact disputes regarding whether, in the moments preceding Mr. Mattingly's handcuffing, Mr. Mattingly was complying with Sergeant Estes's direction to step back, whether Sergeant Estes walked into Mr. Mattingly or whether Mr. Mattingly instead stepped into Sergeant Estes's path, and whether Mr. Mattingly was hampering officers in their efforts to clear the beach by attempting to hand Sergeant Estes papers.  *See, e.g.,* Dkt. No. 40 ¶ 3, Ex. B

26

27

28

United States District Court
Northern District of California

---

[5] As noted above, defendants contend that Mr. Mattingly was initially detained on the beach, and was not arrested until sometime later when he was taken from the beach to the patrol vehicle.  Mr. Mattingly contends he was arrested when he was first handcuffed.

1   (Mattingly Dep. at 53:19-54:2, 64:14-22; 65:14-17, 20-25; 70:8-16); Dkt. No. 40 ¶ 10, Ex. I &

2   Dkt. No. 44-7 (Tabone Dep. at 10:1-17; 11:2-4, 18-24; 14:2-4, 10-13; 14:25-15:8).   Although

3   defendants argue that Mr. Mattingly's subsequent refusal to identify himself supported probable

4   cause to arrest him for violation of California Penal Code § 148(a), the existence of probable cause

5   is determined at the time of the arrest, *see Devenpeck*, 543 U.S. at 153, and here the time of arrest

6   itself turns on underlying disputes of fact.   Accordingly, on the record presented, summary

7   judgment cannot be granted based on probable cause to arrest Mr. Mattingly for violation of

8   California Penal Code § 148(a).

9          Fact disputes also preclude summary judgment on the basis of qualified immunity, as the

10  determination of whether a reasonable officer could have believed that his conduct was lawful can

11  be determined on summary judgment only where materials facts are undisputed.   *See LaLonde v.*

12  *Cnty. of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000); *Ortego v. O'Connor*, 146 F.3d 1149, 1154

13  (9th Cir. 1998).

14         Accordingly, to the extent defendants seek summary judgment on Mr. Mattingly's

15  unlawful arrest claim based on probable cause to arrest him for violation of California Penal Code

16  § 148(a), their motion is denied.   Nonetheless, a question remains whether probable cause

17  supported Mr. Mattingly's arrest based on a violation of California Code of Regulations § 4326.

18  For the reasons discussed below, defendants are entitled to summary judgment on Mr. Mattingly's

19  unlawful arrest claim because probable cause supported Mr. Mattingly's arrest based on § 4326,

20  and defendants would, in any event, be entitled to qualified immunity for such arrest.

21              **2.      California Code of Regulations § 4326**

22                  **a.      Probable cause**

23         California law prohibits the violation of "any provision" of a posted order, "including, but

24  not limited to . . . use periods[.]"  14 C.C.R. § 4326(a).  "Any person who violates the rules and

25  regulations established by [CDPR] is guilty of either a misdemeanor, punishable by imprisonment

26  in the county jail not exceeding 90 days, or by a fine not exceeding one thousand dollars ($1,000),

27  or by both that fine and imprisonment, or an infraction punishable by a fine of not more than one

28  thousand dollars ($1,000)."  Cal. Pub. Res. Code § 5008(d).  It is not disputed that a violation of

1    California Code of Regulations § 4326(a) is an arrestable offense that is filed as a misdemeanor,

2    although officers have the authority to reduce the offense to an infraction.  *See* Dkt. No. 40 ¶ 9,

3    Ex. H (McKenna Dep. at 20:9-25).

4        The undisputed evidence shows that on July 31, 2021, Mr. Mattingly was on Twin Lakes

5    beach after 10:00 p.m., even though posted park hours are from 6:00 a.m. to 10:00 p.m.  Dkt. No.

6    40 ¶ 5, Ex. D; Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 50:18-25; 56:10-12; 57:4, 8-9).  At the

7    motion hearing, Mr. Mattingly confirmed that he does not dispute that he was on the beach after

8    10:00 p.m. that night.  *See* Dkt. No. 49.  When the larger group of officers approached the group

9    on the beach, Sergeant Estes stated that it was after 10:00 p.m., asked the group if they would

10    leave, and then asked Mr. Mattingly if he would leave.  Mr. Mattingly did not leave and continued

11    to try to hand papers to Sergeant Estes.  Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 51:3-10; 51:24-

12    52:5); *see also* Mattingly Ex. ZB.  At the time of his initial encounter with the defendant officers

13    on the date of his arrest, Mr. Mattingly was aware of posted hours indicating that Twin Lakes

14    closed at 10:00 p.m.  Indeed, he noted in his opposition papers and at the motion hearing that, for

15    months prior to July 31, 2021, he and the group had a history of staying on the beach past 10:00

16    p.m. as a means of exercising their claimed right to be there and to protest what they believe are

17    unlawful orders restricting their access.  Dkt. No. 40 ¶ 5, Ex. D; Dkt. No. 40 ¶ 3, Ex. B (Mattingly

18    Dep. at 56:10-12; 57:4, 8-9; 98:21-99:18).

19        When Sergeant Estes asked the group if they would leave, Mr. Mattingly maintains that he

20    did not understand this to be an order to leave the beach.  However, subjective beliefs are

21    immaterial for purposes of the probable cause analysis.  *Whren*, 517 U.S. at 813.  Nor does it

22    matter that Sergeant Estes had not personally told Mr. Mattingly to leave the beach prior to the

23    time the larger group of officers arrived on the beach that night.  In view of the undisputed

24    material facts presented, no reasonable jury could find an absence of probable cause for Mr.

25    Mattingly's arrest for violating California Code of Regulations § 4326.

26              **b.**     **Qualified immunity**

27        Regardless of whether there was a violation of Mr. Mattingly's Fourth Amendment rights,

28    the defendant officers are entitled to qualified immunity because the right at issue was not clearly

1    established as of the date of the incident.

2         "'Qualified immunity attaches when an official's conduct does not violate clearly

3    established statutory or constitutional rights of which a reasonable person would have known.'"

4    *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73 (2017)).  "The

5    two steps in the qualified immunity analysis are (1) 'whether the facts that a plaintiff has

6    alleged . . . or shown . . . make out a violation of a constitutional right' and (2) 'whether the right

7    at issue was "clearly established" at the time of defendant's alleged misconduct.'"  *Johnson*, 79

8    F.4th at 1004 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232, (2009)).  In the context of a claim

9    for unlawful arrest in violation of the Fourth Amendment, the Ninth Circuit has "summarized the

10   two-step qualified immunity inquiry as '(1) whether there was probable cause for the arrest; and

11   (2) whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether

12   reasonable officers could disagree as to the legality of the arrest such that the arresting officer is

13   entitled to qualified immunity.'"  *Id*. at 1005 (quoting *Rosenbaum v. Washoe Cnty*., 663 F.3d

14   1071, 1076 (9th Cir. 2011)).  The "clearly established" prong of the qualified immunity analysis is

15   a matter of law to be decided by the Court, once factual issues are resolved.  *Reese v. Cnty. of

16   Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2017).  "The linchpin of the qualified immunity

17   analysis is the reasonableness of the officer's conduct in the particular case at hand."  *Rosenbaum*,

18   663 F.3d at 1078.

19        Even assuming that the defendant officers lacked probable cause to arrest Mr. Mattingly

20   for violating California Code of Regulations § 4326(a), and construing all facts in Mr. Mattingly's

21   favor, the law did not clearly establish that probable cause was lacking in the specific

22   circumstances presented.  The "reasonable officer standard for qualified immunity differs from the

23   prudent person standard guiding [the] probable cause for arrest analysis."  *Johnson*, 79 F.4th at

24   1005 (citation omitted).  Under the qualified immunity reasonable officer standard, "[a]n officer

25   would not be on notice that his or her action was unreasonable unless 'all reasonable officers

26   would agree that there was no probable cause in this instance.'"  *Id*. (quoting *Rosenbaum*, 663

27   F.3d at 1078).  Here, the question presented is whether the law was clearly established such that an

28   officer on July 31, 2021 would have known that arresting a person for being on Twin Lakes beach

1  after 10:00 p.m., in violation of California Code of Regulations § 4326, was unreasonable, where

2  the arrestee is aware of the posted hours, but nonetheless deliberately remains on the beach based

3  on a claimed right to be there despite the posted hours.

4        Here, Mr. Mattingly indisputably was on the beach after 10:00 p.m., contrary to the posted

5  park hours.  This fact, in addition to the other facts discussed above regarding probable cause,

6  support the conclusion that no clearly established law should have caused a reasonable officer to

7  conclude that Mr. Mattingly was not in violation of California Code of Regulations § 4326 or that

8  his arrest for that offense would be unconstitutional.  There is no indication that § 4326 has been

9  held unconstitutional or otherwise invalidated for any reason.  In his briefing, Mr. Mattingly did

10  not identify any cases suggesting that a reasonable officer would have known that enforcing

11  § 4326 violated a "clearly established" right to be on Twin Lakes beach after 10:00 p.m., despite

12  the posted hours.

13        At the motion hearing, Mr. Mattingly referred to a "Martins Beach" decision involving the

14  "Surfrider Foundation."  *See* Dkt. No. 49.  Although he has provided no citation to the Court, Mr.

15  Mattingly may be referring to *Surfrider Foundation v. Martins Beach 1, LLC*, 14 Cal. App. 5th

16  238 (2017), in which the California Court of Appeal held that the conduct of private coastal

17  landowners in closing public access to the beach constituted "development" under state law,

18  requiring a coastal development permit.  For purposes of the qualified immunity analysis for Mr.

19  Mattingly's Fourth Amendment unlawful arrest claim, *Surfrider Foundation* is inapposite, as it did

20  not involve a claim for unlawful arrest by state actors or California Code of Regulations § 4326.

21  To the extent Mr. Mattingly may contend that *Surfrider Foundation* generally supports his

22  claimed right to be on the beach, despite signs indicating that access is otherwise "closed," the

23  case cannot reasonably be interpreted to support such a position.  Moreover, reliance upon

24  *Surfrider Foundation* as describing clearly established law here would be contrary to the Supreme

25  Court's directive that "the clearly established right must be defined with specificity" and clearly

26  established law cannot be defined "at a high level of generality."  *City of Escondido v. Emmons*,

27  584 U.S. 38, 42 (2019); *see also Kisela*, at 104 ("[S]pecificity is especially important in the Fourth

28  Amendment context, where the Court has recognized that it is sometimes difficult for an officer to

United States District Court
Northern District of California

16

1    determine how the relevant legal doctrine . . . will apply to the factual situation the officer

2    confronts.").

3           Accordingly, even if Mr. Mattingly's arrest for violation of California Code of Regulations

4    § 4326 lacked probable cause, the defendant officers would still be entitled to qualified immunity.

5    The contours of Mr. Mattingly's Fourth Amendment right to be free of unreasonable seizures did

6    not clearly encompass an arrest for violation of § 4326.  The Court's determination regarding

7    probable cause and qualified immunity with respect to the arrest for violation of § 4326 is

8    sufficient to resolve Mr. Mattingly's § 1983 claim for unlawful arrest under the Fourth

9    Amendment.  Defendants' motion for summary judgment on that claim therefore is granted.

10          **C.    Claim 2: Fifth Amendment—False Imprisonment (42 U.S.C. § 1983)**

11          Mr. Mattingly's claim for "Fifth Amendment—False Imprisonment" (Dkt. No. 1 ¶¶ 61-

12   81), brought pursuant to 42 U.S.C. § 1983, alleges that defendants Estes, Thorne, Tabone, and

13   Filous "willfully deprived [Mr. Mattingly] of his liberty without probable cause" and that

14   "[w]ithout [Mr. Mattingly]'s consent, he was taken to Santa Cruz County Jail and deprived of his

15   liberty, due to the actions of [these defendants]."  *Id.* ¶ 62.  Mr. Mattingly alleges that he was

16   detained in the county jail for approximately 12 hours after being arrested without probable cause.

17   *Id.* ¶¶ 73, 75.  Defendants argue that Mr. Mattingly's claim for false imprisonment fails because

18   (1) they had probable cause to arrest him and (2) Penal Code § 847(b) protects them from civil

19   liability on such claim in any event.  Dkt. No. 39 at 2, 9.

20          Although captioned as claim for violation of the Fifth Amendment,[6] the Court construes

21   Mr. Mattingly's false imprisonment allegations as asserting a state law claim for false

22   imprisonment, without lawful privilege.  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 486

23   n.15 (9th Cir. 2007) (quotations and citations omitted).  The elements of a claim for false

24   imprisonment under California law are: "(1) the nonconsensual, intentional confinement of a

25   person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief."

26

27   _____

28   [6] The Fifth Amendment applies only to the federal government, and the federal government is not a defendant here.  *Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008).

United States District Court
Northern District of California

*Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1169 (9th Cir. 2011) (quotation and citation omitted); *see also Easton v. Sutter Coast Hosp.*, 80 Cal. App. 4th 485, 496 (2000). "In California, false arrest is a species of the tort of false imprisonment," *Blankenhorn*, 485 F.3d at 486 n.15, and is " merely one way of committing a false imprisonment," *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1379 (9th Cir. 1998) (quotations and citation omitted). With respect to the second element, "without lawful privilege," a law enforcement officer is not liable for false imprisonment arising out of an arrest if "[t]he arrest was lawful" or the officer "at the time of the arrest, had reasonable cause to believe the arrest was lawful." Cal. Pen. Code § 847(b)(1); *see, e.g.*, *Blankenhorn*, 485 F.3d at 486-87 (arresting officers entitled to immunity pursuant to § 847(b) on state law false imprisonment claim where they had probable cause to arrest plaintiff for trespassing and acted within the scope of their authority under state law, therefore arrest was lawful).

To the extent Mr. Mattingly's false imprisonment claim is based on his contention that he was unlawfully arrested (*see, e.g.,* Dkt. No. 1 ¶¶ 63-64), defendants are entitled to summary judgment. As discussed above, the defendant officers acted within the scope of their authority when they arrested Mr. Mattingly for violation of California Code of Regulations § 4326, *see* Cal. Pub. Res. Code § 5008(b), (c). There are no genuine issues of material fact upon which a jury could conclude that Mr. Mattingly's arrest based on § 4326 was "without lawful privilege."

However, there are other aspects of Mr. Mattingly's false imprisonment claim that are not addressed by defendants' summary judgment motion. Broadly construing the allegations of his complaint, Mr. Mattingly appears to claim that defendants falsely imprisoned him and/or violated his Fourteenth Amendment due process rights by, for example, not taking him immediately before a magistrate judge and informing him that he would instead be detained at the county jail for several days, thereby coercing him into signing a promise to appear for court in order to be released. *See, e.g.*, Dkt. No. 1 ¶¶ 66, 74-75. As the Court cannot adjudicate matters that have not been presented in defendants' summary judgment motion, the Court will seek the parties' input regarding further briefing and/or proceedings regarding these matters, as set out below.

**D.      Claim 3: First Amendment Retaliation (42 U.S.C. § 1983)**

Mr. Mattingly asserts a claim under 42 U.S.C. § 1983 for violation of his First Amendment rights.  Dkt. No. 1 ¶¶ 82-117.  In essence, he claims that defendants "targeted [him] based on his affiliation and involvement in protests against the state and local government" and arrested him in retaliation for exercising his First Amendment rights.  *See id.* ¶¶ 84, 93.  At the motion hearing, Mr. Mattingly clarified that his First Amendment retaliation claim is based on his claimed right to be on the beach after hours, and on two particular activities he engaged in on the night in question: (1) protesting posted park hours by remaining on the beach after 10:00 p.m. and (2) attempting to serve Sergeant Estes with papers.  *See* Dkt. No. 49; *see also* Dkt. No. 1 ¶ 99.

On a claim for First Amendment retaliation, a plaintiff must establish facts showing that (1) he was engaged in a constitutionally protected activity; (2) the defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the defendants' conduct.  *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (citations omitted).  "To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'"  *Nieves v. Bartlett*, 578 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 259 (2006)).  "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury.  Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Id.*  Causation may be shown "with either direct or circumstantial evidence," and the Ninth Circuit has instructed that it "involves questions of fact that normally should be left for trial."  *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002)

For purposes of their motion for summary judgment, defendants do not contest the first two elements of the First Amendment retaliation claim, i.e., that Mr. Mattingly was engaged in protected activit(ies) and that being arrested would chill a person of ordinary firmness from continuing to engage in those activit(ies).  They argue that Mr. Mattingly cannot meet the causation requirement for his First Amendment retaliation claim because there was probable cause

1    to arrest him for being on the beach after 10:00 p.m., and he cannot show that he was arrested

2    while similarly situated individuals not engaged in protected speech were not arrested.

3          Probable cause generally defeats a claim for retaliatory arrest, except in a "narrow" case

4    "where officers have probable cause to make arrests, but typically exercise their discretion not to

5    do so." *Nieves*, 587 U.S. at 406; *Ballentine v. Tucker*, 28 F.4th 54, 62 (9th Cir. 2022). This

6    exception applies if a plaintiff "presents objective evidence that he was arrested when otherwise

7    similarly situated individuals not engaged in the same sort of protected speech had not been."

8    *Nieves*, 587 U.S. at 406; *Ballentine*, 28 F.4th at 62. "Showing differential treatment addresses the

9    causal concern by helping to establish that non-retaliatory grounds were in fact insufficient to

10   provoke the adverse consequences." *Ballentine*, 28 F.4th at 62 (cleaned up; quotations and

11   citation omitted). "Because this inquiry is objective, the statements and motivations of the

12   particular arresting officer are 'irrelevant' at this stage." *Nieves*, 587 U.S. at 407 (quoting

13   *Devenpeck*, 543 U.S. at 153).[7]

14         On the record presented, and assuming without deciding that Mr. Mattingly was engaged

15   in activities protected under the First Amendment, Mr. Mattingly has not shown that he was

16   arrested because he was exercising a claimed First Amendment right to protest posted park hours

17   by remaining on the beach after 10:00 p.m. There is no evidence that others on the beach at the

18   same time but not engaged in a purported protest of park hours were not arrested. However, there

19   is a material fact dispute regarding whether Mr. Mattingly was arrested because he was trying to

20   "serve" papers on Sergeant Estes, which he says is an activity protected by the First Amendment.

21   Defendants do not dispute that officers generally do not arrest someone for a violation of

22   California Code of Regulations § 4326 alone. *See* Dkt. No. 44-3 (Thorne Response to

23   Interrogatory No. 12); Dkt. No. 44-6 (Estes Response to Interrogatory No. 3). Thus, like

24   jaywalking, *see Nieves*, at 587 U.S. at 407, or chalking, *see Ballentine*, 28 F.4th at 62, remaining

25   on the beach after hours "is an offense for which probable cause does little to prove or disprove

26

27   _____

28   [7] For this reason, Mr. Mattingly's assertions about officers' statements and subjective motivations, including whether Sergeant Estes believed Mr. Cogan was a "nice guy" and possibly believed that Mr. Mattingly was not, are immaterial.

United States District Court
Northern District of California

United States District Court
Northern District of California

the causal connection between animus and injury." *Ballentine*, 28 F.4th at 62.  On the one hand, there is evidence that on the night in question, officers went to Twin Lakes solely for the purpose of clearing the beach after hours, and not with the intent to arrest anyone.  *See, e.g.*, Dkt. No. 40 ¶ 7, Ex. F (Estes Dep. at 11:14-15).  As noted above, there are disputed facts regarding whether Mr. Mattingly was complying with Sergeant Estes's orders to step back, whether Sergeant Estes walked into Mr. Mattingly or whether Mr. Mattingly stepped into Sergeant Estes's path, and whether Mr. Mattingly was hampering officers in their efforts to clear the beach by attempting to hand Sergeant Estes papers.  On the other hand, although the record is not entirely clear as to how many times before July 31, 2021 Mr. Mattingly was on the beach after hours, it appears to be undisputed that for at least a year before July 31, 2021 he regularly went to Twin Lakes on weekend evenings to play music.  He testified in deposition that he does not recall personally being told to leave the beach by officers prior to July 31, 2021, and that he was never cited for being on the beach after 10:00 p.m.  *See* Dkt. No. 40 ¶ 3, Ex. B (Mattingly Dep. at 28:7-15). Video evidence submitted by Mr. Mattingly of the encounter with officers a week before on July 24, 2021 indicates that no arrests or citations were issued that night for being on the beach after hours.  *See* Mattingly Ex. ZC.  There is no evidence that on July 31, 2021 anyone other than Mr. Mattingly was arrested for being on the beach after hours, even among the group who remained on the beach after 10:00 p.m. as a means of protesting the posted hours.  On the record presented, a reasonable jury could find that Mr. Mattingly was handcuffed and arrested solely because he was the only one who attempted to hand papers to Sergeant Estes on July 31, 2021.  *See, e.g., Baca v. Anderson*, No. 22-cv-02461-WHO, 2024 WL 2868145, at *9 (N.D. Cal. June 6, 2024) (denying summary judgment on First Amendment retaliation claim where record contained evidence from which jury could infer that plaintiff's "racist cop" speech and recording of officers during protest was a substantial or motivating factor in officer's subsequent use of force).

As it was clearly established that it would be unlawful as of July 31, 2021 to arrest an individual solely for engaging in First Amendment activity, notwithstanding the existence of probable cause to arrest him for an offense, *see Ballentine*, 28 F.4th at 65-66, these fact disputes also preclude summary judgment on the basis of qualified immunity.  *See LaLonde*, 204 F.3d at

1   953; *Ortego*, 146 F.3d at 1154.

2          Accordingly, defendants' motion for summary judgment on Mr. Mattingly's claim for First

3   Amendment retaliation is denied to the extent the protected activity concerns Mr. Mattingly's

4   attempt to serve papers on Sergeant Estes.

5          **E.      Claim 4: California Constitution, Article X, section 4**

6          Mr. Mattingly's state law claim for violation of Article X, section 4 of the California

7   Constitution asserts that defendants violated his "right to access the right of way to navigable

8   water for whatever public purpose is required" when they arrested him for violating California

9   Code of Regulations § 4326(a).  Dkt. No. 1 ¶ 119.  Specifically, Mr. Mattingly contends that the

10  sign stating hours at Twin Lakes was posted without a coastal development permit ("CDP") and

11  the officers' enforcement of § 4326 therefore was unconstitutional.  *See id*. ¶¶ 123-129.  He seeks

12  "compensatory and punitive damages in addition to reasonable attorney fees" based on the

13  claimed violation of the California Constitution.  *Id*. ¶ 130.

14         Article 10, section 4 of the California Constitution concerns "[a]ccess to navigable waters"

15  and provides:

16                No individual, partnership, or corporation, claiming or possessing
                  the frontage or tidal lands of a harbor, bay, inlet, estuary, or other
17                navigable water in this State, shall be permitted to exclude the right
                  of way to such water whenever it is required for any public purpose,
18                nor to destroy or obstruct the free navigation of such water; and the
                  Legislature shall enact such laws as will give the most liberal
19                construction to this provision, so that access to the navigable waters
                  of this State shall be always attainable for the people thereof.
20

21  Cal. Const. Art. 10, § 4.  As an initial matter, it is not clear that Mr. Mattingly may properly

22  invoke this provision to support a direct private cause of action against the defendant CDPR

23  officers.  "While it is true that article X, section 4 of the California Constitution protects access to

24  navigable waters, that section also explicitly calls for legislative implementation."  *Sumner Hill*

25  *Homeowners' Ass'n, Inc. v. Rio Mesa Holdings, LLC*, 205 Cal. App. 4th 999, 1024 (2012), *as*

26  *modified on denial of reh'g* (May 30, 2012); *see also generally Graf v. San Diego Unified Port*

27  *Dist.*, 7 Cal. App. 4th 1224, 1231 (finding that boaters do not have constitutional right to

28  unregulated long-term anchorage in public navigable waters, noting that "[t]he state's authority to

United States District Court
Northern District of California

control and regulate usage of its navigable waterways is absolute when it is acting within the terms of the public trust.").

Defendants correctly note that the California legislature has enacted legislation giving CDPR the power to promulgate "rules and regulations not inconsistent with law for the government and administration of the property under its jurisdiction." Cal. Pub. Res. Code § 5003. As discussed above, Twin Lakes is part of the California state park system, which is within CDPR's jurisdiction and control. *See* Cal. Pub. Res. Code §§ 5001(a)(3), (b); 5001.6(b)(6)(A). Under its authority, CDPR has promulgated rules regulating aspects of the public use of Twin Lakes, including the park hours at issue here. *See* 14 C.C.R. § 4300. Courts "presume the validity of a regulation promulgated by a state agency." *In re Gadlin*, 10 Cal. 5th 915, 926 (2020) (citing *Ass'n of Cal. Ins. Cos. v. Jones*, 2 Cal. 5th 376, 389 (2017)). "The burden lies with the party challenging the regulation to show its invalidity." *Id*.

Mr. Mattingly notes that in deposition Captain McKenna testified that park closure signs do not have a CDP, but Mr. Mattingly provides no support for his apparent contention that a CDP is required here.[8] Mr. Mattingly does not identify any legislation implementing Article X, section 4 of the California Constitution that proscribes California Code of Regulations § 4326, nor has he cited any court decision finding that this regulation violates Article X, section 4 of the California Constitution or that the regulation has been invalidated in any way.

Accordingly, defendants' motion for summary judgment on Mr. Mattingly's claim for violation of Article X, section 4 of the California Constitution is granted. Additionally, for the reasons discussed below, Mr. Mattingly's claim for money damages for a purported violation of this provision is barred in any event.

### F.   Claim 5: Government Claims Act

Mr. Mattingly's complaint includes a claim titled "California Government Claim" that

---

[8] At the motion hearing, Mr. Mattingly alluded to a Coastal Commission report, discussed during Captain McKenna's deposition, that reportedly notes that the California Coastal Commission "is in a continuing conversation with State Parks staff regarding this issue." *See* Dkt. No. 44-26 (McKenna Dep. at 15:9-11; 16:10-16). The report has not been provided and it is unclear whether it has any legal significance.

1    seeks over $1 million in damages against the seven officers who were present at Twin Lakes on

2    the night in question (i.e., Sergeant Estes and Officers Thorne, Tabone, Weaver, Ward,

3    Ackemann, and Filous).  Dkt. No. 1 ¶¶ 131-135 and pp. 22-35.  Defendants argue that Mr.

4    Mattingly's "California Government Claim," is barred because he did not comply with the claim-

5    filing deadlines of the California Government Act.  Additionally, even assuming Mr. Mattingly

6    had a viable claim for violation of Article X, section 4 of the California Constitution, defendants

7    argue that his failure to comply with the California Government Act bars his claim for damages.

8          Under the California Government Claims Act, and subject to exceptions not present here, a

9    plaintiff cannot sue a public entity, or a public employee, for "money or damages" until he has

10   presented the "claim" to that entity, and the entity has either acted upon or rejected the claim.  Cal.

11   Gov. Code §§ 905, 945.4, 950.2.  "'It is well-settled that claims statutes must be satisfied even in

12   face of the public entity's actual knowledge of the circumstances surrounding the claim.'"

13   *DiCampli-Mintz v. Cnty. of Santa Clara*, 55 Cal. 4th 983, 991 (2012) (quoting *City of Stockton v.*

14   *Superior C*t., 42 Cal. 4th 730, 738 (2007)).  "Additionally, a suit against a public employee for

15   actions taken within the scope of their employment is barred if the suit against the public entity

16   would be barred by the Government Claims Act."  *Ogando v. Natal*, No. 23-cv-02221-JSC 2023

17   WL 8191089, at*3 (N.D. Cal. Nov. 27, 2023) (citing Cal. Gov. Code §§ 950, 950.2).

18         The defendant officers contend that Mr. Mattingly did not timely submit a claim as

19   required by the Government Claims Act.  Under the Government Claims Act, a claim must be

20   submitted within six months of the accrual of the cause of action.  Cal. Gov. Code § 911.2.  The

21   "failure to timely present a claim for money or damages to a public entity bars a plaintiff from

22   filing a lawsuit against that entity."  *Cal. v. Superior Ct.*, 32 Cal. 4th 1234, 1239 (2004).

23   Defendants correctly note that Mr. Mattingly was arrested and his claim accrued on July 31, 2021.

24   *See Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1109 (1988) (cause of action accrues on date of

25   injury).  As stated in his complaint, Mr. Mattingly did not submit a claim until nearly two years

26   later, on May 15, 2023.  Dkt. No. 1 ¶ 131.  Mr. Mattingly has provided no evidence to the

27   contrary.  Although he argues that "defendants' government codes do not supersede Constitutional

28   provisions" (Dkt. No. 44 at 31), the fact that his claim is based on the California Constitution

United States District Court
Northern District of California

24

neither excuses compliance with the Government Claims Act, nor renders that Act unconstitutional.  *See City of San Jose v. Superior Ct.*, 12 Cal. 3d 447, 454-55 (1974).

Accordingly, the defendant officers' motion for summary judgment is granted with respect to the damages component of the fourth claim for relief based on California Constitution, Article X, section 4.  For the same reason, defendants' motion for summary judgment is also granted with respect to Mr. Mattingly's fifth claim titled "California Government Claim."  In any event, defendants are correct that the Government Claims Act is not a basis for a separate claim for relief.  *See City of San Jose*, 12 Cal. 3d at 455 (purpose of Government Claims Act "is to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation.").

## IV.    CONCLUSION

Based on the foregoing, defendants' motion for summary judgment is granted in part and denied in part as follows:

1. Defendant CDPR's motion based on Eleventh Amendment immunity is granted.  All remaining claims against CDPR are dismissed.

2. Defendants' motion is granted with respect to Mr. Mattingly's claim under 42 U.S.C. § 1983 for unlawful arrest (Fourth Amendment).

3. Defendants' motion is granted with respect to Mr. Mattingly's claim for false imprisonment, to the extent that claim is based on alleged false arrest.

4. Defendants' motion is denied with respect to Mr. Mattingly's First Amendment retaliation claim, but only to the extent that the claim is based on Mr. Mattingly's claimed protected activity of attempting to serve papers on Sergeant Estes; the motion is granted as to Mr. Mattingly's First Amendment claim in all other respects.

5. Defendants' motion is granted with respect to Mr. Mattingly's claim for violation of Article X, section 4 of the California Constitution, including his claim for damages.

6. Defendants' motion is granted with respect to Mr. Mattingly's "California Government Claim."

As discussed above, this order does not address issues regarding Mr. Mattingly's false

imprisonment claim that were not addressed in defendants' motion.  A case management conference is set for **October 4, 2024, 10:00 a.m.** in Courtroom 2, Fifth Floor of the San Jose courthouse to discuss the parties' proposals as to further proceeding in view of this order.  Any party who wishes to appear via Zoom may do so by contacting the courtroom deputy at vkdcrd@cand.uscourts.gov **no later than 12:00 p.m. on October 3, 2024.**  The parties need not file a case management statement in advance of the conference.

   **IT IS SO ORDERED.**

Dated: September 30, 2024

Virginia K. DeMarchi
United States Magistrate Judge